FILED

01/25/2024

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 5, 2023

**STATE OF TENNESSEE v. ERIC PIKE**

**Appeal from the Circuit Court for Lauderdale County**
**No. 11208    A. Blake Neill, Judge**

_____

**No. W2023-00351-CCA-R3-CD**
_____

The Lauderdale County Grand Jury indicted Defendant, Eric Pike, on one count of attempted second degree murder, one count of aggravated assault by strangulation, and one count of violating an order of protection. Pursuant to a plea agreement, Defendant pleaded guilty to the count of aggravated assault by strangulation, and the remaining counts were dismissed. Per the parties' agreement, the trial court classified Defendant as a Range III persistent offender and imposed a ten-year sentence. After a sentencing hearing, the trial court ordered Defendant to serve this sentence in custody of the Tennessee Department of Correction (TDOC) and consecutively to an existing sentence for initiation of the process to manufacture methamphetamine. Defendant then filed a motion to withdraw his guilty plea, which the trial court denied. Defendant appeals, arguing: (1) the trial court erred in denying Defendant's motion to withdraw his guilty plea; and (2) the trial court abused its discretion by ordering Defendant to serve his sentence consecutively to his existing sentence. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

Bryan R. Huffman, Covington, Tennessee, for the appellant, Eric Pike.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Mark E. Davidson, District Attorney General; and Joni R. Glenn, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Facts and Procedural History

On the night of May 9, 2020, Claudia Fisher received a telephone call from her juvenile grandson that he had found the home of her daughter, Garianna Prince (the victim), ransacked and the glass of the door broken. After calling his grandmother, the child left to spend the night with a friend, and Mrs. Fisher made repeated telephone calls to her daughter which went unanswered. Along with her husband, Mrs. Fisher went to the victim's home the next morning and found the victim's car was missing. She and her husband entered the home through the broken back door, and discovered the victim in the attic. The victim was unconscious, foaming from the mouth, and taking shallow breaths. The victim had duct tape around her throat and her wrist. Paramedics transported the victim to a hospital where she was placed on a ventilator and remained unconscious for five days. Police officers visited the hospital, and observed bruising to the victim's face, neck, and knees and what appeared to be a carpet burn on her right knee.

Officers developed Defendant as a suspect and the likely cause of the victim's injuries. Defendant was formerly in a romantic relationship with the victim, and there was a history of abuse by Defendant and the victim, resulting in several prior court appearances.

Officers located Defendant's cellphone at Dana Burns's house, a location where law enforcement had previously interacted with Defendant. Defendant was not at Ms. Burns's when investigators arrived, but Ms. Burns shared with investigators that on May 9, 2020, Defendant asked her to inform his employer that he would not be at work that day. Afterward, Ms. Burns and Defendant drove to the victim's home. Though Ms. Burns remained in the vehicle, she could hear Defendant and the victim arguing inside the house. When Defendant exited the house, he looked visibly upset. He accused the victim of infidelity and shared with Ms. Burns that he wanted to hurt a man named John Burns who "had broken up his family."

Officers located and arrested Defendant on the evening of May 10, 2020. Defendant had an active warrant for violating his probation. He admitted to "assaulting" the victim by "hitting her multiple times" and "strangling" or "choking her to the point . . . where her airway was cutoff" but stated that he was trying to prevent her from swallowing Klonopin. Defendant said he left the victim in the attic "snoring." When officers asked Defendant why he never called to get the victim help, Defendant said he "should have." Officers found no Klonopin pills around the vicinity of the victim, and a toxicology report revealed no Klonopin in the victim's system.

At the time of his offense, Defendant was on probation and had a violation of probation warrant in Lauderdale County Circuit Court Case Number 9592 for initiation of the process to manufacture methamphetamine. On June 7, 2021, a Lauderdale County Grand Jury returned a three-count indictment charging Defendant with attempted second degree murder (Count 1), aggravated assault by strangulation (Count 2), and violating an order of protection (Count 3). The State filed a notice to seek enhanced punishment for Defendant based on his status as a career offender under Tennessee Code Annotated section 40-35-108.

## A. Guilty Plea

Defendant reached a negotiated plea agreement with the State, and a guilty plea hearing was held on June 20, 2022. Pursuant to the agreement, Defendant pleaded guilty to Count 2, with an agreed-to sentence of ten years. Defendant also would be considered as a Range III persistent offender under Tennessee Code Annotated section 40-35-107, and would have a forty-five percent release eligibility date on his ten-year sentence. In exchange for Defendant's guilty plea, the other counts would be dismissed. The record contains a written plea agreement, which states that the trial court would "consider probation" or "house arrest," and whether the sentence would be "consecutive or not." The written agreement was signed by the State, Defendant's attorney, and the trial court.

At the plea hearing, the terms of the plea agreement were discussed by the parties. The State specified that at a later date, "the [c]ourt [would] determine the manner of service and whether it [would] run concurrent or consecutive to the current sentence [Defendant] is serving in TDOC custody." Defense counsel also noted:

> [Defendant] understands that what he's pleading to, obviously, is a felony offense. In this case the length of time being [ten] years at [forty-five] percent with the [c]ourt to consider probation, house arrest or other relief and whether or not the sentences ought to run consecutive or concurrent at a future date at Your Honor's discretion with regard to the setting of that matter.

The trial court placed Defendant under oath, and reviewed the charges with Defendant. After Defendant indicated he understood the charges against him, the court reviewed the following terms of the plea agreement with Defendant:

> The Court: It's my understanding that you're going to enter a plea of guilty in Count 2 today, but as a persistent offender and not as a career offender, so that range would be [ten] to [fifteen] years to serve at a rate of [forty-five] percent before your release eligibility

- 3 -

date. And that upon entrance of that plea, Count 1 and Count 3 will be dismissed; is that your understanding?

Defendant: Yes, sir.

Defendant further stated that he understood his right to plead not guilty and proceed to trial, his right to confront witnesses and cross-examine the witnesses at that trial, and his right against self-incrimination. Defendant assured the trial court that he was waiving those rights. Defendant stated he was satisfied with his legal representation, that he was freely and voluntarily entering the guilty plea, and that he did not have any questions for his attorney or for the court. Defendant acknowledged the plea agreement he reached with the State, and the court accepted his guilty plea.

## B. Sentencing Hearing

Defendant's sentencing hearing was held on September 6, 2022. A presentence investigation report was prepared and exhibited to the hearing. At the time of the hearing, Defendant was forty-three years old, and a review of the report revealed convictions dating back to when he was eighteen. Defendant had a lengthy felony criminal history, with prior convictions for two counts of aggravated burglary, two counts of felony theft, conspiracy to distribute narcotics, initiation of the process to manufacture methamphetamine, and promoting the manufacture of methamphetamine. His prior misdemeanor convictions included domestic assault, five counts of simple assault, vandalism, two counts of possessing illegal narcotics, violating an order of protection, and multiple driving offenses. The report also revealed Defendant had completed several stints of inpatient drug rehabilitation and was attempting to obtain his GED after dropping out of high school in the eleventh grade. Defendant had a sporadic employment history, and no regular source of income. Defendant's validated risk and needs assessment score was "High Violent." At the time of the sentencing hearing, Defendant was serving a twelve-year sentence in TDOC for violating his probation in Lauderdale County Circuit Court Case Number 9592.

The State called the victim as a witness at the sentencing hearing. The victim stated that she and Defendant were in a relationship for fifteen years and described the relationship as violent and abusive. Throughout the relationship, Defendant told the victim that she "should kill" herself, that her kids "don't need" her, and that her "kids hated" her. He used methamphetamine during their relationship and attempted rehabilitation "eight" times, but he "always" went back to using drugs.

The victim recalled that on May 10, 2020, which was also Mother's Day, Defendant strangled her and left her in her attic "to die." Her mother found her "barely alive," and the victim was airlifted to the hospital where she was placed on a ventilator and remained

- 4 -

unconscious for five days. The victim stated that she struggled to get through life after the attack, constantly looking over her shoulder thinking "[Defendant] will show up to finish the job." She added, "I am begging the [c]ourt to please sentence [Defendant] to the maximum sentence so that he can't hurt, kill me or anyone else again. And so that me and my children can have a peaceful life and no longer live in fear." The victim's testimony was consistent with the victim impact statement that she had provided and was contained in Defendant's presentence investigation report.

Defendant testified on his own behalf. He stated that he began using drugs when he was around fourteen years old. He admitted to criminal convictions dating back to the age of eighteen and to receiving his first methamphetamine conviction at the age of twenty-five. Defendant testified he had received his GED while incarcerated, and was attempting to "get [his] life turned around." He also testified, "I don't want no probation or house arrest. I am not ready to come back, not yet." When asked about his previous domestic assault cases involving the victim, Defendant responded:

> We've done drugs, me and her. Our whole relationship was us doing drugs and drinking. We've always fought. We would get on drugs and we would drink and we would fight each other. She would decide she wanted to go smoke crack, and she would kick me out of the house. And then I would end up doing meth because I was hurt. Just an excuse, you know what I mean. I was an addict.

Defendant conceded to his drug use as referenced by the victim, as well to several of his criminal convictions involving drugs. When asked about the May 10, 2020 assault, Defendant could not recall the victim's condition but stated, "I thought she was messed up on pills. I watched her eat pills. . . . I thought she was messed up on pills. She was laying there snoring. We were talking. Next thing I know, she's snoring." He stated that he then texted Dana Burns to come get him, and left with her. Defendant testified that he had no ill will toward the victim, but he did not want to be around her. He acknowledged that he inflicted the victim's injuries on May 10, 2020, and that the victim could have died. On cross examination, when it was brought to Defendant's attention that the victim's toxicology report revealed no illegal drugs in her system, he admitted that day she had only taken drugs that "were prescribed to her."

The trial court began its sentencing analysis by considering the evidence presented at the hearing, stating, "[Defendant] admitted that he caused those injuries. The evidence shows that . . . [the victim] was severely beaten and strangled by [Defendant]." The court then moved to the nature and characteristics of the criminal conduct involved and noted the offense was "very serious. [The victim] was in the hospital for ten days. This could have easily been a murder trial. So the [c]ourt would be hard pressed to find a more serious

- 5 -

crime of conduct." The court found that no mitigating and enhancement factors were offered, and regarding statistical information provided by the Administrative Office of the Courts (AOC), it noted that "the AOC doesn't provide statistical information for a C felony persistent offender." The court addressed Defendant's validated risk and needs assessment, finding it showed "that [Defendant] is a high[-]risk offender with a propensity for violence." The court did give Defendant "some credit for stating that he's not ready to get out at this time."

The trial court then considered the principles of sentencing and the parties' arguments as to sentencing alternatives. The court noted that the "[g]uidelines state the defendant who is a standard offender convicted of C felonies should be considered a favorable candidate for alternative sentencing options." The court correctly stated that Defendant was not a standard offender based on Defendant's criminal history and Defendant's agreement he was a persistent offender. Next, the court discussed the considerations for imposing a sentence involving confinement:

> One, that confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct. The presentence report confirms that. So that factor does apply. [Defendant] does have a long history of criminal conduct.
>
> Confinement is necessary to avoid depreciating the seriousness of the offense. I think that standard applies as well considering the seriousness of the offense. And then finally, measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant. I think that factor applies as well considering the number of times [Defendant's] been on probation.

The court then articulated its basis for ordering Defendant's sentence to be imposed consecutively to his existing twelve-year sentence, explaining that "[Tennessee Code Annotated section] 40-35-115(b) says the [c]ourt may order sentences to run consecutively if . . . the defendant is sentenced for an offense committed while on probation." The court also referenced Defendant's plea agreement, which allowed him to plead guilty as a persistent as opposed to a career offender:

> You're already [receiving] the benefit of the fact that you were allowed to [plead] down [to] a persistent as opposed to a career. And you got the lowest end on a persistent. A persistent carries a ten to [fifteen]-year sentence at [forty-five] percent. You were allowed to plea to a ten. If you would have been convicted as a career, then you were looking at [fifteen] years at [sixty] percent.

The court sentenced Defendant to ten years in confinement, to serve consecutively to his existing twelve-year sentence for the probation violation.

## B. Motion to Withdraw Guilty Plea

On October 12, 2022, Defendant filed a pro se motion to withdraw his guilty plea under Rule of Criminal Procedure 32(f).[1] The trial court appointed different counsel to represent Defendant, and conducted a hearing on the motion on February 22, 2023. At the hearing, Defendant was the only witness. Defendant stated it was his understanding when he pleaded guilty that he would serve ten years at forty-five percent which would be served concurrently with his existing sentence. After he learned his sentence was to be served consecutively with his existing sentence, he spoke to his attorney who said he would "look in to it." Defendant alleged, "I was told something completely different. I entered it not knowing—I didn't know that that was going to happen or I wouldn't have took it." When asked whether he heard his attorney say it was within the court's discretion to decide whether his sentence was concurrent or consecutive, Defendant replied, "No, sir, I didn't pay no attention to that." Defendant claimed he was not moving to withdraw his plea because he had "a change of heart," or because he was dissatisfied with his sentence.

On cross-examination, Defendant admitted to reading and signing the written plea agreement, but stated he "did not understand [it]." He also admitted the plea agreement was "recited twice into the record" but claimed "[t]hat paper says a whole bunch." The State read to Defendant the following from the guilty plea hearing transcript:

> [Defendant] was noticed as a career offender. Subject to the [c]ourt's approval, he's pleading to Count 2, which is a C felony aggravated assault by strangulation. Counts 1 and 3 are being dismissed. He's pleading as a persistent [offender]. He'll get ten years at [forty-five] percent. . . . [W]e are leaving it up to the [c]ourt for a later date for sentencing for the [c]ourt to determine the . . . manner of service . . . whether it will run concurrent or consecutive to the current sentence that he's serving in TDOC custody.

Defendant acknowledged that he heard the prosecutor announce the foregoing at his plea hearing, but stated when he asked his attorney, his attorney said, "don't worry about it, it's going to be concurrent." Defendant admitted he told the trial court at the plea hearing

---

[1] Defendant's pro se motion to withdraw his guilty plea was not received until after thirty days following the entry of the trial court's sentencing order. However, as the trial court correctly found, the motion was placed in the prison mail system before the thirty-day filing period expired, thus making the motion timely.

that no one had promised him anything, and that he had no questions for his attorney or the trial court.

In its oral findings, the trial court stated:

> [W]e have [Defendant's] testimony saying he misunderstood it. But in contradiction to [Defendant's] testimony, we have a signature on a plea form from the day of the plea that says ten years at [forty-five] percent all suspended after, and then it says, [c]ourt to consider probation or house arrest and whether consecutive or not. That's on the plea form.
>
> . . . .
>
> The [c]ourt does not find that there is manifest injustice here by not allowing the withdraw of the plea. [Defendant] is essentially asking me to believe that [trial counsel] either lied directly to him or lied to the [c]ourt by standing up and saying that [trial counsel] knew that it was going to be up to me to determine whether it was going to be consecutive. And the [c]ourt is not going to credit [Defendant's] testimony over [trial counsel's] even though he hasn't testified here today.

The trial court subsequently entered a written order denying Defendant's motion.

Defendant timely appealed.

## II. Analysis

Defendant argues the trial court abused its discretion when it denied his post-sentencing motion to withdraw his guilty plea. The State argues the trial court's denial of Defendant's motion to withdraw his plea is substantially supported by the record. We agree with the State.

## A. Guilty Plea

A defendant must enter a guilty plea voluntarily, knowingly, and intelligently, and the record must demonstrate that the plea satisfies these requirements. *State v. Crowe*, 168 S.W.3d 731, 748 (Tenn. 2005) (citing *Brady v. United States*, 397 U.S. 742, 748 (1970)); *State v. Mellon*, 118 S.W.3d 340, 345 (Tenn. 2003) (internal citations omitted). Trial courts ensure that guilty pleas are proper by advising and questioning the defendant about the plea, confirming the plea is voluntary, and finding a factual basis for the plea. Tenn. R. Crim. P. 11(b). Whether a defendant should be allowed to withdraw his guilty plea is

within the sound discretion of the trial court. *Mellon*, 118 S.W.3d at 345-46 (citing *Henning v. State*, 201 S.W.2d 669, 671 (Tenn. 1947)).

On appeal, this court reviews a trial court's decision regarding a motion to withdraw a guilty plea for an abuse of discretion. *Crowe*, 168 S.W.3d at 740; *State v. Turner*, 919 S.W.2d 346, 355 (Tenn. Crim. App. 1995). "An abuse of discretion exists if the record lacks substantial evidence to support the trial court's conclusion." *Crowe*, 168 S.W.3d at 740 (citing *Goosby v. State*, 917 S.W.2d 700, 705 (Tenn. Crim. App. 1995)). "A defendant does not have a unilateral right to withdraw a plea." *Id.* (citing *Mellon*, 118 S.W.3d at 345). A defendant's right to withdraw a guilty plea is governed by Tennessee Rule of Criminal Procedure 32(f):

> (1) Before sentence is imposed, the court may grant a motion to withdraw a guilty plea for any fair and just reason.
>
> (2) After sentence is imposed but before the judgment becomes final, the court may set aside the judgment of conviction and permit the defendant to withdraw the plea to correct manifest injustice.

Here, Defendant entered his guilty plea on June 20, 2022. The trial court sentenced Defendant on September 6, 2022. Defendant filed his pro se motion to withdraw his guilty plea after that date. Because Defendant filed the motion to withdraw his guilty plea "after the sentence [was] imposed but before the judgment [became] final," the more demanding standard, "to correct manifest injustice," applies to our review of this issue. *Crowe*, 168 S.W.3d at 741; *see* Tenn. R. Crim. P. 32(f). Though Rule 32(f) does not define "manifest injustice," Tennessee "courts have identified circumstances that meet the manifest injustice standard necessary for withdrawal of a plea." *State v. Virgil*, 256 S.W.3d 235, 240 (Tenn. Crim. App. 2008).

> Withdrawal to correct manifest injustice is warranted where: (1) the plea was entered through a misunderstanding as to its effect, or through fear and fraud, or where it was not made voluntarily; (2) the prosecution failed to disclose exculpatory evidence as required by *Brady v. Maryland*, 373 U.S. 83, 83 (1963), and this failure to disclose influenced the entry of the plea; (3) the plea was not knowingly, voluntarily, and understandingly entered; and (4) the defendant was denied the effective assistance of counsel in connection with the entry of the plea.

*Id.*

- 9 -

Importantly, a finding of manifest injustice is not appropriate where a defendant has a "change of heart," is unsatisfied with "harsh punishment imposed by a trial court or jury," or a plea was entered to avoid "harsher punishment." *Turner*, 919 S.W.2d at 355. The burden is always on the defendant to demonstrate withdrawal of the guilty plea is necessary to avoid manifest injustice. *Id.*

Initially, Defendant concedes that the only applicable factor in this case that demonstrates a manifest injustice is the first factor—"the plea was entered through a misunderstanding as to its effect, or through fear and fraud, or where it was not made voluntarily." *Virgil*, 256 S.W.3d at 240. Defendant argues that his guilty plea was entered through misunderstanding as to its effect for three reasons: (1) his trial attorney ensured him that his sentence would be concurrent not consecutive to his existing sentence; (2) Defendant previously had an offer of a concurrent sentence of fifteen years at thirty-five percent which would have resulted in a shorter period of incarceration; and (3) although Defendant was a career offender, he was unfamiliar with sentencing hearings.

Defendant's sworn testimony at his guilty plea hearing refutes this claim. It demonstrates that he agreed that he understood the plea agreement and that the trial court fully explained the charges and potential sentences. The trial court made it clear that it would decide the manner of service of Defendant's sentence and whether he would serve the sentences concurrently or consecutively. The record reveals that the trial court carefully reviewed the rights that Defendant was waiving and confirms that Defendant responded appropriately to questions. Defendant said that he was not under the influence of any substance at the plea hearing, and there is no evidence Defendant was under the influence of alcohol or drugs when he pleaded guilty. Defendant denied he was pressured to plead or offered anything in exchange for his plea. Furthermore, Defendant stated that he was satisfied with trial counsel's representation. Defendant could have expressed any concerns or misunderstandings when he entered his guilty plea, but he did not do so. On this record, we cannot find that the trial court abused its discretion in denying Defendant's motion as there was no manifest injustice that would require the withdrawal of Defendant's guilty plea. This issue is without merit.

## B. Sentencing

Next, Defendant argues, "[g]iven [Defendant's] understanding of the effect of the plea as more fully set forth, . . . the trial court abused its discretion in imposing a consecutive sentence." We disagree.

We review a trial court's decision to impose consecutive sentences for an abuse of discretion standard if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" *State v.*

- 10 -

*Pollard*, 432 S.W.3d 851, 861–62 (Tenn. 2013). The trial court must find at least one of the statutory grounds by a preponderance of the evidence. *See* Tenn. Code Ann. § 40-35-115(b). Two of these grounds include whether a defendant was on probation when the offense was committed, and whether the defendant is an offender whose record of criminal activity is extensive. *Id*. at § 40-35-115(b)(2), (6).

"When imposing consecutive sentences, the [trial] court must still consider the general sentencing principles that each sentence imposed shall be 'justly deserved in relation to the seriousness of the offense,' 'no greater than that deserved for the offense committed,' and 'the least severe measure necessary to achieve the purposes for which the sentence is imposed.'" *State v. Gregory*, No. M2023-00166-CCA-R3-CD, 2023 WL 8801163, at *6 (Tenn. Crim. App., Dec. 20, 2023) (first quoting Tenn. Code Ann. §§ 40-35-102(1), -103(2), -103(4); then quoting *State v. Imfield*, 70 S.W. 3d 698, 708 (Tenn. 2002)). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Pollard*, 432 S.W.3d at 862 (first citing Tenn. R. Crim. P. 32(c)(1); then citing *State v. Bise*, 380 S.W.3d 682, 705 (Tenn. 2012)).

Here, the trial court found that consecutive sentences were proper, pursuant to Tennessee Code Annotated section 40-35-115(b)(6), because Defendant "was on probation when he committed this offense." Further, the court considered the appropriate sentencing principles in making its determination. In doing so, the trial court sufficiently articulated its reasons for imposing consecutive sentences, and the record supports its decision. As such, Defendant cannot overcome the presumption that his consecutive sentences were reasonable, and the trial court did not abuse its discretion. Defendant is not entitled to relief on this issue.

## III. Conclusion

For the reasons stated above, we affirm the judgment of the trial court.

_____
MATTHEW J. WILSON, JUDGE